William REED, Jr., et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant.

Civ. A. Nos. 3–76–0414–H, 3–77–0782–H and CA–3–77–1554–H.

United States District Court, N.D. Texas, Dallas Division.

Dec. 22, 1981.

 

James H. Baumgartner, Jr., Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, Tex., for plaintiffs.

E. Brice Cunningham, Dallas, Tex., for objector-plaintiffs.

Ira Butler, Cantey, Hanger, Gooch, Cravens & Munn, Fort Worth, Tex., William M. Rippey, Strasburger & Price, Dallas, Tex., for defendant.

1. The case was originally assigned to Judge Taylor, who held a class certification hearing in January 1979. Before he had ruled on the class certification issue, however, the case was transferred to this Court. At the request of counsel, a de novo hearing was scheduled for April 1980.

## OPINION AND ORDER

SANDERS, District Judge.

The original complaint in this litigation was filed in March 1976, pursuant to Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. In April 1980, the Court held an evidentiary hearing to determine whether the case should proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure.[1] At the conclusion of that hearing, on April 18, 1980, the Court entered an order certifying a class of all blacks who had been employed by General Motors ("GM") at the GM Assembly Plant in Arlington, Texas, on any date since September 17, 1970, and who had been discriminated against because of their race in the areas of job placement, promotion, transfer, work assignment, and discipline. Mr. James H. Baumgartner was designated attorney for the class.

Prior to the class certification hearing, attorneys for both sides conducted extensive discovery and engaged in preliminary settlement negotiations. Following the hearing, more information was exchanged and further negotiations took place. On July 7, 1981, the attorneys filed a Joint Motion to Approve and Enter Consent Decree, advising the Court that they had agreed on the terms of a proposed settlement, and requesting that the Court approve it. After reviewing the agreement with the attorneys, the Court entered an Order Tentatively Approving the Consent Decree and Directing Notice to the Class. At the same time the Court scheduled a hearing on the proposed settlement for September 11, 1981. Pursuant to the Court's order, copies of the agreement and notice of the hearing were mailed to all class members.[2]

2. By agreement of counsel, membership in the class was determined by reviewing GM's employment records through and including July 1981. At that time, the class consisted of 1517 members. Prior to the September 11 hearing, Mr. Baumgartner filed a list of 148 persons whose mail was returned unclaimed. The Court assumes that the remaining class members did receive notice.

Prior to the September 11th hearing, the Court received written objections from over 600 members of the class, including 23 of the 27 named Plaintiffs. At the hearing, Mr. Walter Irvin appeared as counsel on behalf of many of the objecting class members to identify their complaints and cross examine witnesses called in support of the proposed settlement.[3] Those objectors who were not represented by Mr. Irvin, and who had objections that he did not address, were given the opportunity to testify. At the conclusion of the hearing, the Court reserved ruling on counsels' motion for final approval of the decree. That motion is now before the Court.

### The Legal Standard

■ In a case such as this that has continued for over five years, there is a great temptation to ignore the interests of the parties in attempting to bring the case to a quick resolution. Time and time again the courts have recognized this temptation, and have warned against it. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1223 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Armstrong v. Board of School Directors,* 616 F.2d 305, 327 (7th Cir.1980). Thus, while the Court acknowledges the strong policy favoring settlements of cases such as this, it is not unmindful of its responsibility to those unnamed class members on whose behalf this suit was originally brought. *See Pettway,* 576 F.2d at 1169, 1214. The Court's duty in evaluating the propriety of a proposed settlement is not to determine whether it is the most efficient means of resolving the case; but rather to determine whether it is a "fair, adequate, and reasonable" resolution. *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977); *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195 (5th Cir. 1981).

■ To guide the Court in making that determination, the Fifth Circuit has outlined a three-step process:

In the first two steps, the court must decide two key issues: the range of possible recovery if plaintiffs prevail on the merits and the likelihood that plaintiffs will, in fact, prevail. In the third step of the process, the court, in its discretion must decide if the settlements are reasonable in light of these determinations. In doing this, the court is not confined to the mechanistic process of comparing the settlement to the estimated recovery times a multiplier derived from the likelihood of prevailing on the merits. The court should also be guided by other factors, the relevancy of which will vary from case to case.... After the court identifies these factors and explains their relevance to the settlement, it should proceed to explain why it is either approving or disapproving the settlement.

*Corrugated Container,* 643 F.2d at 217. With these principles in mind, the Court makes the following findings and conclusions.

### Step One: Determining the Likelihood of Success

Five areas of discrimination were identified at the class certification hearing and certified in the Court's April 18, 1980, order. Because these categories cover a broad range of prohibited practices, they will be discussed independently below.

#### A. Job placement, transfer, and promotion

Plaintiffs and the class do not contest GM's hiring practices, but do contend that the company discriminates against blacks after they have been hired. Specifically, they claim that, as a result of GM's policies and practices regarding job placement, a disproportionate number of blacks are

---

**3.** Shortly after copies of the agreement and notice were distributed, several of the named plaintiffs contacted Mr. E. Brice Cunningham to represent them at the September 11 hearing. Mr. Cunningham appeared on their behalf at a pre-hearing conference, but was ill and unable to attend the hearing. At his request, Mr. Irvin was allowed to appear instead. The Court entered an Order on October 14, 1981, allowing Mr. Baumgartner to withdraw as counsel for some of the named Plaintiffs and substituting Mr. Cunningham as their counsel.

placed in lower level non-salaried positions, while whites are placed in higher paying and physically less demanding positions. Similarly, plaintiffs claim that GM's promotional policies and practices prevent blacks from moving into upper level positions, and thus, aggravate the problems created by defendant's allegedly discriminatory placement practices.

■ To support these claims, plaintiffs have produced statistical evidence comparing the number of blacks and whites in certain job categories. This evidence, which is set forth in the charts reproduced below,[4] reflects that, indeed, a disproportionate number of blacks occupy lower level positions. In 1970, for example, blacks composed 13.42% of the overall workforce, but only .59% of the sixth level supervisors (1 out of 170). Similarly, in 1976, blacks composed 15.45% of the workforce, but only 4.2% of the supervisors (8 of 190). GM concedes that this statistical disparity exists but emphasizes the progress it has made in the past several years. In 1977, for example, 7 out of 12, or 58% of the employees promoted were black, although blacks composed only 18.51% of the workforce.[5] While such progress should be recognized and encouraged, it does "not render moot the questions presented in this litigation or make judicial sanctions inappropriate." *Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir.1972). It is well settled that "practices ... neutral on their face ... cannot be maintained if they operate to freeze the status quo of prior discriminatory practices." *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *Senter v. General Motors Corp.,* 532 F.2d 511, 526 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

In addition to statistical evidence, Plaintiffs produced evidence at the pre-certification hearing regarding the manner in which placement and promotional decisions were made at GM. As the testimony from the hearing reflects, workers were either recommended for promotion by their supervisor or required to apply for the position they desired. Applicants were then required to take standardized tests and to interview with a committee of their immediate supervisors. The decision on promotion was based in large part on the committee's subjective evaluation of the individual. After hearing this testimony at the class certification hearing, the Court found that it tended to support the class claims. Without making any final determination at this point, *See Cotton v. Hinton,* 559 F.2d at 1330, the court reaffirms its previous finding. *See Senter,* 532 F.2d 511; and *Rowe,* 457 F.2d 348.

■ Given the strong statistical disparity still existing between the number of blacks and whites in salaried positions, and the nature of GM's policies, the Court finds that if the case went to trial the class would have a good chance of proving its claim of discrimination in the areas of job placement and promotion. *See generally, Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Parson v. Kaiser Aluminum,* 575 F.2d 1374 (5th Cir.1978), *cert. denied,* 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); *Senter,* 532 F.2d 511; *Rowe,* 457 F.2d 348.

### B. Work Assignment

Plaintiffs also contend that black employees at the Arlington plant are assigned jobs that are physically more demanding than those assigned to whites. Due to the subjective nature of this claim, Plaintiffs would have to call individual class members to testify about these practices, rather than rely on statistical evidence. In this area,

4.

|  | At 12/31/70 | At 12/31/76 |
|---|---|---|
| Blacks as % of total workforce | 13.42% | 15.45% |
| Total 6th level supervisors | 170 | 190 |
| Total Black 6th level supervisors | 1 | 8 |

|  | At 12/31/70 | At 12/31/76 |
|---|---|---|
| Blacks as % of total 6th level supervisors | .59% | 4.2% |

Taken from class settlement Exhibits 1–6 and 2–7.

5. Class settlement Exhibit 7.

they would have the burden of proving intentional discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Burdine v. Texas Dept. of Community Affairs,* 450 U.S. 248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Without having heard any testimony, the Court cannot evaluate the strength of this claim. The court notes and approves, however, of those decisions holding that class-wide discrimination may be proved by individual testimony. *See Eubanks v. Pickens-Bond Construction Co.,* 635 F.2d 1341, 1345 (8th Cir.1980); *Crawford v. Western Electric Co.,* 614 F.2d 1300, 1318 (5th Cir.1980).

## C. Discipline

Plaintiffs' final contention is that blacks are punished more severely than whites for similar acts of misconduct. After reviewing GM's disciplinary records, however, Mr. Baumgartner advised the court that he could find little support for the class claims.[6] Based on counsel's representations, the Court finds that the class would have little chance of establishing discrimination in this area. *See Cotton v. Hinton,* 559 F.2d at 1330.

*Step Two: Defining the Range of Recovery*

■ In the areas of job placement, promotion, and transfer, a back pay award would be appropriate if the class prevailed. *See generally Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396; *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1375 (5th Cir.1974). In *United States v. U.S. Steel,* 520 F.2d 1043, 1055 (5th Cir.1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976), the court described the district courts' responsibility in assessing such an award: "the district court, with the assistance of the parties, should strive to the fullest practicable degree to award back pay by reconstructing hypothetically each eligible claimant's work history." This individual approach is not always required, however. "[W]hen the class size or the ambiguity of promotion or

hiring practices or the multiple effects of discrimination or the illegal practices continued over an extended period of time" makes such an approach impractical, *Pettway,* 494 F.2d 211, 261 (5th Cir.1974), "the court should search for a more pragmatic method of calculation." *Id.,* n. 150, quoting *United States v. Georgia Power,* 474 F.2d 906, 922 (5th Cir.1973). In developing a classwide remedy, the district courts are awarded broad discretion. *Pettway,* 494 F.2d 211; *Sabala v. Western Gillette, Inc.,* 516 F.2d 1251, 1265 (5th Cir.1975).

At the September 11th hearing, class counsel and GM's statistical expert explained how they had calculated the company's potential liability. The court has reviewed the exhibits that reflect their calculations[7], and concludes that they accurately identify the amount of back pay that would be awarded if the class prevailed. Those exhibits require some explanation, however. Class settlement Exhibits 1 and 3–1 and defendant's Exhibit 2 reflect Mr. Baumgartner's initial damage calculation. In Exhibit 1, for each of the relevant years, counsel computed the salary differential between a representative sixth level supervisor and a representative hourly worker. In Exhibit 3–1, counsel then compared the number of blacks who should have been supervisors (based on the percentage of blacks in the workforce) to the number who were supervisors and arrived at a figure representing the deficiency in black supervisors for that year. To calculate the total damages, counsel multiplied the deficiency by the salary differential for each year, and added the yearly totals.

As defendant's counsel suggested, however, and Mr. Baumgartner concedes, Exhibit 3–1 fails to account for those supervisors who were placed in supervisory positions prior to the filing of this suit. By adjusting the calculations to account for those supervisors who were already in place, counsel arrived at the $142,790 figure reflected in defendant's Exhibit 8 and used

---

6. Class settlement Exhibit 12.

7. Defendant's Exhibits 1 through 7; class settlement Exhibits 1 and 3–1.

in their negotiations. With some minor adjustments, that figure represents the amount that the class could reasonably expect to recover if it prevailed at trial. *See Wilkins v. University of Houston,* 654 F.2d 388, 397–399 (5th Cir.1981). First, however, the figure should be adjusted to include any fringe benefits received by salaried personnel and not received by hourly workers. *Pettway,* 494 F.2d at 263. Second, the figure should include some compensation for those class members, if any, who were denied promotion into the seventh, eighth, and unclassified levels.[8] After reviewing class settlement Exhibits 11 and 5 and noting in particular the small percentage of employees holding those positions and the length of service required, the Court is persuaded that this minor adjustment would not significantly alter the final award.

In the areas of work assignment and discipline, injunctive relief would be appropriate if the class prevailed. While this relief cannot be expressed in a dollar amount, it should be and has been considered an important aspect of the potential recovery.

*Step Three: The Final Analysis*

The final step in the *Corrugated* test is to determine whether the settlement is reasonable in light of the factors previously discussed and other factors discussed below. In considering first the factors previously discussed, the Court concludes that the settlement is a reasonable compromise of all the claims.

The Court has determined that the class has a good chance of proving that GM discriminated in the areas of job placement, transfer, and promotion. While this finding weighs against approval of the settlement, it must be considered in the context of the remedies available. In comparing the recovery provided in the settlement ($200,000 and GM's representation that it will not discriminate) with the potential recovery ($142,000, adjusted to reflect fringe benefits and discrimination in levels seven and above, and injunctive relief), it is

apparent that the settlement substantially remedies any class injury.

The Courts have also outlined other factors to be considered in determining the propriety of a settlement. *See Corrugated Container,* 643 F.2d 195; *Cotton v. Hinton,* 559 F.2d at 1331; H. Newberg, *Class Actions,* Vol. 3, § 5610 (1977). After considering these factors, the Court is further persuaded that the settlement is fair and reasonable.

First, as the record reflects, counsel for the class was an experienced Title VII litigator and an able and vigorous class representative. There is no suggestion in the record of any collusion between class counsel and defendant's counsel; and this Court finds none. The Court further notes that counsel discussed the terms of the proposed settlement with most of the named plaintiffs and obtained their initial approval before approaching the Court. In light of these facts, the "court is entitled to rely upon the judgment of ... counsel ..." and, indeed, "should be hesitant to substitute its own judgment for that of counsel". *Cotton,* 559 F.2d at 1330, citing *Flinn v. FMC Corporation,* 528 F.2d 1169 (4th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

Second, the negotiations leading to the settlement took place at a late stage in the proceedings after extensive discovery had been completed and much information exchanged. When a settlement is reached at such a stage, the Court is entitled to give even greater weight to counsel's representations about its adequacy. *See generally* Newberg, *Class Actions, supra* at § 5610b.

Finally, and perhaps most importantly, the court has considered the objections to the settlement. As was previously discussed, over 600 members of a class of 1517 and 23 of 27 named plaintiffs filed objections to the decree. While this factor is not controlling, *Cotton,* 559 F.2d at 1331, it is significant and must be carefully weighed. *Pettway,* 576 F.2d at 1217.

---

8. These levels include the officers and managers, technicians, engineers, and professionals. Counsel presumably focused on the sixth level positions because they require less experience and specialization.

Most of the objections that were filed fell within one of five categories. First, some objectors complained about the way the award was allocated. Specifically, they complained that the decree excludes class members who did not obtain at least two years of service and who were hired after the filing of the lawsuit. These exclusions were more than adequately explained by counsel at the hearing. With regard to the exclusion of class members with less than two years of service, counsel explained that such individuals could not prove that they were discriminated against in the placement, promotion, and transfer areas, where the classes' overall chance of success was greatest. The Court concurs in that conclusion. As Plaintiffs' statistics suggest, very few, if any, employees with less than two years experience were promoted to supervisory positions, regardless of their race. The average length of service prior to entry into sixth level positions was 13.3 years overall and 11.5 years for blacks.[9] It was reasonable, therefore, to allocate a greater portion of the settlement to those members with more experience and to exclude those with less than the minimum experience necessary to be considered for salaried positions. Similarly, the decision to exclude those who were hired after the filing of the lawsuit, was justifiable. As defendant's Exhibits 8 and 11 reflect, and the Court has previously discussed, promotional opportunities improved substantially after the filing of this suit. As a consequence, it is reasonable to assume the blacks hired prior to 1976 suffered greater harm than those hired subsequent thereto.

Second, some objectors contend that the monetary damages are insufficient. The Court has discussed in great detail its reasons for accepting counsels' determination as to the defendant's potential liability. No further explanation is necessary.

Third, many objectors complained about the lack of remedial relief in the decree.

These objections are particularly serious in light of the Court's finding that such relief would be appropriate if the class prevailed. In response to these objections, defendant contends that paragraph A of the decree adequately protects the interests of the class. The Court agrees. Paragraph A contains GM's promise that it will not discriminate against blacks. Although that representation is contained in a consent decree rather than a court order, it is enforceable by the Court under its inherent power to enforce settlement agreements. *See Cotton v. Hinton,* 559 F.2d at 1339. Given that fact, the Court is of the opinion that the decree adequately protects the class against future discrimination.[10]

The remaining objections go to GM's refusal to admit that it discriminated and to the alleged unfairness of the decree. The Court has reviewed these objections and is of the opinion that they are without merit.

Having considered all of the factors discussed in *Corrugated Container* and other controlling cases, and having reached the foregoing conclusions, the Court is of the opinion that the consent decree filed on July 7, 1981, should be and it is hereby APPROVED.

Counsel for the class will promptly submit a form of judgment appropriate for entry.

SO ORDERED.

---

9. Class settlement Exhibit 5.

10. It is also significant that GM has adopted an affirmative action program that is subject to audit by the Department of Labor. This program was described by GM in a Memorandum filed September 23, 1981. *See Cotton v. Hinton,* 559 F.2d at 1338.