**Elsie Mae HEYMANN, Plaintiff,**

v.

**TETRA PLASTICS, INC., Defendant.**

**No. 77–983C(C).**

United States District Court,
E. D. Missouri, E. D.

Dec. 11, 1979.

Melba I. Parente, Clayton, Mo., for plaintiff.

Thomas M. Hanna, St. Louis, Mo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEREDITH, District Judge.

This matter was tried to the Court. The Court has been duly advised by testimony, exhibits, and briefs of the parties. The Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff is a white female who was first hired by defendant on April 4, 1971.

2. Defendant is an employer within the meaning of 42 U.S.C. § 2000e and is engaged in the business of manufacturing plastic extrusions.

3. Plaintiff complains and alleges that: (a) she was denied equal pay for equal work because she was a female, (b) she was not given an opportunity to learn various phases of the extrusion operation because she was a female and that males were given this opportunity, (c) she was denied promotion to assistant supervisor and that a male, Gary Larkins, was promoted to assistant supervisor in 1975 when she, in fact, was better qualified, (d) she was transferred from the third shift to the first shift as a reprisal because she filed a complaint with the Equal Employment Opportunity Commission (EEOC), and as a result lost the added $0.15 per hour paid on the third shift over the first shift, and (e) she suffered layoffs because she was a female and lost pay while males were not laid off in 1972.

4. On July 1, 1975, plaintiff filed her initial charge with the EEOC, charging sex discrimination and failure to promote her to the position of assistant supervisor of the third shift. On August 4, 1976, plaintiff perfected her original charge. On March 7, 1977, plaintiff filed a new charge alleging retaliation by the company because she had filed the original charge. The EEOC issued a right-to-sue letter on June 17, 1977. This suit was filed on September 13, 1977.

5. Plaintiff was originally hired in the fabrication department at $2.09 per hour base pay. The most money she had earned prior to that time was $2.00 per hour. She had no supervisory experience or manufacturing experience prior to being hired by defendant. Since plaintiff went to the third shift, she actually made a 15¢ per hour premium, making her salary $2.24 per hour. On April 14, 1972, plaintiff received a raise to $2.49 per hour because she had been with the company for one year. On August 5, 1972, plaintiff received a rate increase to $2.65 per hour. On March 24, 1973, plaintiff received a merit increase to $2.95 per hour. On May 12, 1973, plaintiff received a rate increase to $3.15 per hour. On July 1, 1973, she was promoted to an E–3 and on October 13, 1973, she received a merit increase which brought her pay to $3.64 per hour. On May 4, 1974, plaintiff received a rate increase to $3.96 per hour. On September 4, 1974, she received a rate

increase and a merit increase to $4.25 per hour. On January 4, 1975, she received a rate increase to $4.31 per hour. On May 10, 1975, she received a rate increase and a merit increase to $4.91 per hour. On September 6, 1975, she received a rate increase to $5.01 per hour. On January 10, 1976, she received a rate increase to $5.11 per hour. On July 31, 1976, she was receiving $5.55 per hour. On February 5, 1977, she received a rate increase to $5.65 per hour. On February 19, 1977, she was transferred to the first shift, lost the 15¢ per hour premium pay, and was reduced to $5.50 per hour. On April 9, 1977, she received a 1¢ increase to $5.51 per hour. On July 9, 1977, she was receiving $5.56 per hour. On August 27, 1977, she was transferred back to the third shift and received $5.71 per hour. On January 7, 1978, she received a rate increase to $6.11 per hour. On April 15, 1978, she received an increase to $6.12 per hour. On April 22, 1978, she was given the job of lead person at $6.42 per hour. On May 20, 1978, she was demoted as a lead person and received $6.12 per hour. On June 17, 1978, she was reassigned the job of lead person at $6.42 per hour. On July 1, 1978, she was transferred to the second shift at $6.07 per hour. On July 22, 1978, she received a rate increase to $6.27 per hour. On January 6, 1979, she received $6.52 per hour. On April 14, 1979, she received $6.53 per hour. On May 19, 1979, she was transferred to the second shift at $6.48 per hour.

6. In 1970 the makeup of the company was approximately 80% male and 20% female. At the time of the trial the work force was approximately 50% male and 50% female and had grown from 50 employees in 1971 to over 100 employees in 1975.

7. In December of 1971, Hussmann Refrigerator cancelled its order with the defendant and a great number of persons were laid off during the year 1972. During 1972 the plaintiff lost 16 weeks of work. There is no showing that her layoff was in any way motivated or caused by the fact that she was a female. After the Hussmann Refrigerator work was lost by the defendant, it eventually received business making plastic skis and accessories, which increased its business and caused it to hire more employees.

8. Plaintiff Elsie Mae Heymann, in the years 1972 through sometime in 1974 began dating her supervisor, a Mr. Ralph Vandeven. Plaintiff was married and had three children. Vandeven was also married but separated from his wife. This romance continued until sometime in 1974. During the time that plaintiff was dating Vandeven her promotions were rapid, her efficiency reports were good, and all went well insofar as she was concerned on the third shift. After her break-up with her supervisor sometime in 1974, her efficiency reports were not as good and neither were her pay increases. The break-up of this romance also accounted for a strained relationship between her and her supervisor.

9. The Labor Department conducted an investigation of the plant and wrote a report which indicated that the defendant company was starting women at lower pay than men; that the company, which had no personnel department, did not have a definitive category for each one of its grades, and that it had no uniform policy about promotions or merit increases. This matter was disposed of in February of 1976 with no action being taken by the Labor Department. However, the company abolished all E–4 positions and made the highest position on the production line an E–3a. Plaintiff and two males were reduced from an E–4 rating to an E–3a early in 1977. Her pay was not reduced and the company, after the Labor Department investigation, which terminated in early 1976, hired a personnel expert who made an effort to define the categories of each position, and on his recommendation the company abolished the E–4's, reduced them to E–3a's, and also abolished merit increases.

10. A look at plaintiff's rise in salary as she worked for the company shows that, regardless of starting pay between men and women, in her instance her rise was rapid and she lost no pay because she was a female. Her relationship with her supervisor would indicate that because she was a

female, as a matter of fact, she made more pay than she was entitled to make or qualified to earn.

11. Plaintiff was incensed when Ron Chitwood was made an assistant supervisor in July of 1975. Plaintiff Heymann filed her charge with the EEOC on July 1, 1975, because she had heard that Larkins was to be promoted to an assistant supervisor. This actually did not take place until July 25, 1975, at which time he was transferred from the third shift to the second shift. The position of assistant supervisor paid 25¢ per hour more, but by going to the second shift he went from a 15¢ premium to a 10¢ premium because of the shift change, so in reality his net gain was 20¢ per hour. Plaintiff's deposition testimony indicates that she would not have left the third shift for an increase in pay because her three children came home during the second shift and she wanted to be with them. Her testimony at trial differed from that of her deposition in that she testified she would have transferred if promoted. However, a review of Heymann's performance as an operator indicates that her experience had been limited, that she did a good job on those things she knew how to do, but that she was not mechanically inclined and did not understand many of the workings of the machines. On one occasion the machine did not work properly because the belts were too tight. On another occasion she cleaned machines and put the filter in wrong which resulted in a disruption of production and partial destruction of the machines which she had cleaned and put back together improperly. On the other hand, at that particular point in time, Larkins was an employee who knew how to work the machinery and understood nuances of fine tuning the plastic which was extruded under heat and pressure, which Heymann did not, and he was entitled to the job as assistant supervisor. Heymann was not. In her deposition Heymann testified and admitted that she was not qualified to do many jobs because she had not been properly trained even though she had achieved the rating of E–4, later reduced to E–3a, which was the highest rating of a production worker.

12. The reason for Heymann's transfer to the first shift from the third shift was not because of reprisal on the complaint she made to the EEOC but because of the fact that she constantly complained that she was not given enough training. The third shift did not receive the variety of work that was done on the first and second shifts. Accordingly, Heymann was transferred to the first shift on February 19, 1977. Soon thereafter, on March 7, 1977, she went to the EEOC and filed a charge claiming that her transfer to the first shift was in retaliation for having filed her original charge and having perfected it thereafter. Plaintiff Heymann's performance on the first shift was observed closely and on several occasions she performed very badly and not in accordance with the rating which she had received with the company. Many things she was unable to do and was totally unfamiliar with.

13. After Larkins' promotion to assistant supervisor he began to go down hill and was later discharged by the company.

14. The company did not have any females in a supervisory capacity on the production line. It did have one female in the bookkeeping and record keeping part of the company who was a supervisor.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction by virtue of 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. §§ 1988, and 2000e.

2. The record shows some evidence of discrimination against females insofar as their starting salary was concerned, but insofar as the plaintiff is concerned, her rapid rise in the company may very well be attributed to her sex and she has not lost any pay because she was a female.

3. The Court is of the opinion that there is no substantial evidence that she was denied promotion because of her sex or was laid off because of her sex or suffered retaliation because of her complaint to the EEOC.

4. The plaintiff has not made a prima facie case of discrimination, and if she had, it has been amply rebutted by the defendant. This cause will be dismissed with prejudice at the cost of the plaintiff.