Elsie Mae HEYMANN, Appellant,

v.

TETRA PLASTICS CORPORATION, Appellee.

No. 80–1039.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1980.

Decided Jan. 30, 1981.

Rehearing and Rehearing En Banc Denied March 2, 1981.

Melba I. Parente, Clayton, Mo., for appellant.

* The Honorable Elmo B. Hunter, sitting by designation on this panel, is now Chief Judge of the United States District Court for the Western District of Missouri.

Thomas M. Hanna, St. Louis, Mo., for appellee.

Before STEPHENSON and HENLEY, Circuit Judges, and HUNTER,* District Judge.

HENLEY, Circuit Judge.

The appellant, Elsie Mae Heymann, individually brought this action against the appellee, Tetra Plastics, Inc. (Tetra), alleging that Tetra had engaged in discriminatory and unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, §§ 703–704, 42 U.S.C. §§ 2000e–2 to 3. The district court,[1] after a hearing, found that Heymann failed to establish a prima facie case under Title VII, or, in the alternative, that if such a prima facie case was established it had been rebutted by Tetra. Accordingly, judgment was entered in favor of the appellee, Tetra. From this judgment Heymann appeals. We affirm.

## I.

Tetra was created in 1964 to perform the customized extrusion of plastic products. Until 1970 Tetra primarily performed extrusion work, and performed little supplementary work on the extruded product. In 1970 Tetra contracted with Hussmann Refrigerator Co. to extrude and finish certain plastic products. At the time this contract was entered into Tetra's plant had only one department, the extrusion department. To meet the demands of the Hussmann contract Tetra established a fabrication department which was responsible for performing supplementary work on plastic parts produced in the extrusion department. Tetra employed approximately ten people to work in the fabrication department.

All individuals hired to work in the fabrication department were female. Any male hired subsequent to establishment of the fabrication department was assigned to an-

1. United States District Court for the Eastern District of Missouri, The Honorable James H. Meredith, Senior District Judge, presiding, 482 F.Supp. 510.

other department in the plant. As a result of these job assignments, the fabrication department became a "female department." Tetra explains this phenomenon by alleging that only females applied for those jobs available in the fabrication department. Appellant challenges this explanation and claims that a job application with Tetra was general and for no specific department. She claims to have expressed no interest in any specific department when applying for a job with Tetra. Appellant contends that the "female fabrication department" resulted from Tetra intentionally assigning only females to that department and intentionally assigning males to other departments. The district court made no finding concerning this issue, and for purposes of this appeal we will assume appellant's contention to be true.

Appellant was one of those individuals employed to work in the fabrication department. She was hired on April 4, 1971 to work on the third shift and was paid an entry level wage of $2.24 per hour.[2] All other individuals working in the fabrication department performing substantially similar work were also paid the entry level wage. Employees in the fabrication department were not as a general rule, however, paid as much as individuals working in the extrusion department, particularly not as much as those individuals responsible for operating the extrusion machines. Operating the extrusion machines required more skill than any other job in the plant.

In May, 1972 Tetra began classifying employees according to the jobs they performed. Employees working in the fabrication department were classified either F–1 or F–2, and employees working in the extrusion department were classified either E–1, E–2, E–3 or E–4. Only employees classified either E–3 or E–4 operated the extrusion machines. At the inception of this classification system, appellant was classified F–2 and was receiving a wage of $2.49 per hour, having been given a raise since being hired.

In October, 1972 Hussmann Refrigerator Co. terminated its contract with Tetra. This termination necessitated the laying off by Tetra of sixteen employees, three men and thirteen women. Every employee in the fabrication department was laid off. This departmental layoff is not surprising considering that the fabrication department was created only in response to the Hussmann contract. At the time of her layoff appellant was receiving a wage of $2.65 per hour, having been given a raise in August, 1972. Appellant was laid off for sixteen weeks and returned to work in December, 1972.

When appellant returned to work she was reclassified as E–2. Appellant was reclassified because fabrication work was no longer performed on the third shift. She was paid $2.80 per hour, six cents more per hour than the only male classified E–2. After returning to work appellant rapidly received several raises and in September, 1973 was being paid $3.15 per hour as an E–2. In September, 1973 the average wage of all males classified E–2 was $3.08 per hour.

In October, 1973 appellant received a promotion and was classified as an E–3.[3] This promotion came rapidly and there is evidence indicating that appellant was promoted to E–3 without adequate training. Appellant, as an E–3, was rated as qualified to operate the extrusion machines. She apparently experienced difficulty operating them and often angered her supervisors. However, this experience would not appear to have been uncommon since Tetra maintained no formal training program.[4]

2. The hourly wage figures used in this opinion reflect any shift premium an employee might have received. This shift premium ranged up to 15¢ per hour.

3. The district court found that appellant was promoted to E–3 in July, 1973. This finding is erroneous. The record indicates, and the parties agree, that appellant was promoted to E–3 in October, 1973.

4. At Tetra training is acquired while on the job and is a function of an employee's capabilities, desire to learn, and rapport with more knowledgeable co-workers. Appellant alleges that Tetra denied her training. We find this allegation to be meritless.

Any difficulty appellant had performing her job was not reflected in the wage she was paid. After her promotion to E–3 and several subsequent raises, appellant, in May, 1974 was being paid $3.96 per hour. The average wage of all males classified E–3 in May, 1974 was $4.02 per hour. In May, 1975 appellant received a promotion and was classified as an E–4, receiving a wage of $4.91 per hour. She was the first female to be classified E–4. The only other employee in the plant classified as an E–4, a male, was being paid $5.01 per hour.

Soon after receiving the promotion to E–4 appellant learned that Tetra was seeking an assistant supervisor for the second shift. Appellant pursued this position and was told that her performance as an employee indicated she was not the best qualified person for the job. Tetra indicated that Gary Larkins, a male employee, was going to receive the job of assistant supervisor, as he indeed did on July 28, 1975. After learning that she would not receive the assistant supervisor job, appellant, on July 1, 1975, filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging that Tetra had discriminated against her because she was female.

On January 21, 1977 the EEOC issued a Letter of Determination finding cause to believe that Tetra had discriminated against the appellant in violation of Title VII. Soon after this action by the EEOC, Tetra, in February, 1977, restructured its job classification system by abolishing E–4 and establishing E–3a as the highest classification. In accordance with this restructuring appellant was reclassified as an E–3a and her wages were frozen temporarily. Not long after being classified as an E–3a appellant was removed from the third shift and transferred to the first shift. While on the first shift appellant's work was monitored closely. She received poor job performance reports and was inept at performing the tasks expected of a person with her job classification. Appellant worked on the first shift for only a short time and was then reassigned to the third shift. At the time of her reassignment appellant was being paid $5.56 per hour, more per hour than any other employee, female or male, working in the extrusion department.

In light of the above mentioned events transpiring subsequent to the EEOC's issuance of a Letter of Determination, appellant, in March, 1977, filed a second complaint with the EEOC alleging that Tetra had retaliated against her for filing her initial complaint. On September 13, 1977 appellant filed the present action in the district court alleging that Tetra had discriminated against her for the reason that she was a female. Appellant alleged that Tetra violated Title VII by (1) assigning her to the fabrication department, (2) denying her equal pay, (3) subjecting her to a layoff, (4) denying her the job of assistant supervisor, and (5) retaliating against her for filing a complaint with the EEOC.[5] The district court found appellant's allegations meritless, and concluded that Tetra had not violated Title VII.

We address first Tetra's alleged violations of section 703 of Title VII.

## II.

██ Appellant relies on a disparate treatment theory to establish a section 703 violation. *See generally Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575 n.7, 98 S.Ct. 2943, 2948 n.7, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977). A case proceeding on this theory is divided into three phases. *McCosh v. City of Grand Forks*, 628 F.2d 1058, 1062 (8th Cir. 1980). Phase one requires that a plaintiff establish a prima facie case by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it

---

**5.** Appellant also alleges that Tetra failed to evaluate her, failed to let her acquire experience, failed to promote her, and retaliated against her by abolishing the assistant supervisor job. These allegations are frivolous and do not merit discussion.

is more likely than not that such actions were 'based on a discriminatory criterion illegal under [Title VII].' " *Furnco Const. Co. v. Waters*, 438 U.S. at 576, 98 S.Ct. at 2949 (quoting in part *International Brotherhood of Teamsters v. United States*, 431 U.S. at 358, 97 S.Ct. at 1866).

■ Assuming a prima facie case has been established, phase two then requires that the employer articulate a legitimate consideration upon which its employment decision was based. *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978); *Ligons v. Bechtel Power Corp.*, 625 F.2d 771, 773 (8th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 400, 66 L.Ed.2d 246 (1980). To meet this requirement an employer need not prove the absence of a discriminatory motive. *Board of Trustees v. Sweeney*, 439 U.S. at 24–25, 99 S.Ct. at 295, 296; *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 702 (8th Cir. 1980). An employer need only produce evidence from which one may reasonably infer the presence of a legitimate consideration.

If an employer articulates a legitimate consideration, phase three then affords the plaintiff an opportunity to prove that this consideration is merely a pretext for a discriminatory motive. *McCosh v. City of Grand Forks*, 628 F.2d at 1062. The plaintiff carries the burden of persuasion in establishing a pretext. *Kirby v. Colony Furniture Co.*, 613 F.2d at 703.

With this general analytical framework in mind, we turn to the specific instances of Tetra's alleged discriminatory conduct.

*Job Assignment.*

■ Appellant contends that her initial job assignment to the fabrication department was made discriminatorily. Although this contention may have some merit, the district court was without jurisdiction to make such a determination. Appellant was hired and her initial job assignment made on April 4, 1971. On July 1, 1975, appellant filed her initial complaint with the EEOC. More than four years elapsed between appellant's initial job assignment and the filing of her initial complaint with the EEOC.

■ Filing a timely complaint with the EEOC is a prerequisite to the district court's jurisdiction. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555 n.4, 97 S.Ct. 1885, 1887 n.4, 52 L.Ed.2d 571 (1977); *Satz v. ITT Financial Corp.*, 619 F.2d 738, 742 (8th Cir. 1980); *Smith v. Office of Economic Opportunity*, 538 F.2d 226, 228 (8th Cir. 1976). A complaint is timely when "filed within one hundred and eighty days after the alleged unlawful employment practice occurred." Equal Employment Opportunity Act of 1972 § 4(e), 42 U.S.C. § 2000e–5(e) (amending Civil Rights Act of 1964, Pub.L. No. 88–352, § 706(d), 78 Stat. 241). Appellant's failure to file a complaint within 180 days after the date of her initial job assignment left the district court without jurisdiction to entertain any subsequent complaint concerning the same conduct.

■ We note that the initial job assignment, like a hiring decision, in no respect constitutes a continuing violation. *Compare, e. g., Smith v. Office of Economic Opportunity*, 538 F.2d at 228, with *Cedeck v. Hamiltonian Federal Savings & Loan Ass'n*, 551 F.2d 1136, 1137 (8th Cir. 1977). To conclude as much would ignore the policy underlying the 180 day limitation period, that policy being to "protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State College v. Ricks*, —— U.S. ——, ——, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980).

*Equal Pay.*

■ Appellant contends that as a female she was discriminated against by being denied equal pay. We find no merit in this contention. "To show a prima facie case [appellant] must prove she performed substantially equal work as her [fellow employees] but was paid less for it." *Strecker v. Grand Forks County Social Services Board*, 640 F.2d 96 at 100 (8th Cir. 1980).

To establish that she was paid less, appellant compares her wage to that of one rival

male employee, Gary Larkins. Appellant, in April, 1971, was hired to work in the fabrication department and received a wage of $2.24 per hour. Larkins was hired in October, 1971 to work as an operator in the extrusion department and received a wage of $2.84 per hour. In September, 1971, not long after Tetra implemented its classification system, appellant worked in the fabrication department and was paid $2.65 per hour while being classified F–2. In September, 1971 Larkins worked as an operator in the extrusion department and was paid $3.30 per hour while being classified E–3. In December, 1972 appellant was paid $2.80 per hour and was classified E–2. In December, 1972 Larkins was paid $3.30 per hour and classified E–3. Not until February, 1974 were appellant and Larkins in the same job classification, which at that time was E–3.

Appellant and Larkins were classified identically from February, 1974 until July, 1975, at which time Larkins was promoted to assistant supervisor. A comparison of their respective wages for that time period shows the following: in May, 1974 appellant was paid $3.96 per hour and Larkins was paid $4.36 per hour; in December, 1974 appellant was paid $4.25 per hour and Larkins was paid $4.45 per hour; in May, 1975 both appellant and Larkins received a promotion to E–4, resulting in appellant being paid $4.91 per hour and Larkins being paid $5.01 per hour.

In July, 1975 Larkins was promoted to assistant supervisor. He remained in that position until February, 1977, at which time he transferred to the extrusion department as an operator. When Larkins transferred to the extrusion department, he and appel-lant were classified identically and received the same wage.

Examining the employment histories of appellant and Larkins shows that for only a short period of time, February, 1974 until July, 1975, were they performing substantially similar work. At all other times appellant and Larkins were classified differently. The various classifications reflected different jobs which required varying degrees of skill, effort and responsibility. A higher job classification indicated that more skill was required and more responsibility given. Extrusion operator, the job requiring the greatest skill, was assigned the highest classification.

Excluding the period of time beginning February, 1974, and ending July, 1975, appellant has failed to establish a prima facie case because she has not shown that the work she performed was substantially similar to that performed by Larkins. Any wage differential to which appellant was subjected was authorized by a disparity in the work being performed.[6] Civil Rights Act of 1964 § 703(h), 42 U.S.C. § 2000e–2(h).[7]

The time period between February, 1974 and July, 1975, presents a different problem. Appellant has shown she was performing substantially similar work, thus establishing the first element of her prima facie case. Our inquiry for this period of time focuses on the second element of the prima facie case, was appellant being paid less than her fellow employees?

A comparison of appellant's wage to Larkins' wage indicates that appellant was paid less. Comparing appellant's wage to the average wage of all male employees per-

---

**6.** While arguably an alleged disparity in job classification might be attributable to discrimination that occurred in the initial job assignment, any complaint appellant may have had concerning her initial job assignment is barred. See *Job Assignment* discussion *supra.* Giving effect to past discriminatory conduct is not in itself a violation of Title VII. See note 10 *infra.*

Appellant's equal pay claim might also have merit if she established that the disparity in job classification resulted from a continuing discriminatory promotion policy. She has, however, made no such showing. See note 5 *supra.*

**7.** Section 703(h) permits any wage differentiation authorized by 29 U.S.C. § 206(d). Section 206(d) authorizes a wage differentiation when jobs require different levels of skill, effort and responsibility. Such was the case when appellant worked in the fabrication department.

forming substantially similar work indicates that appellant did not receive less pay.[8]

This average wage is derived from a sample comprised of the entire male work force. The comparison wage relied on by appellant is derived from a sample consisting of one male employee. A particularized sample of this size carries little evidentiary value, particularly when there exists other more reliable data, *i.e.*, the average wage. *See Eubanks v. Pickens-Bond Const. Co.*, 635 F.2d 1341 at 1350 (8th Cir. 1980).

Throughout the relevant time period, Larkins was the highest paid employee in his particular job classification. This makes apparent the self-serving nature of appellant's comparison. A comparison of appellant's wage to the wage of a male employee other than Larkins would show, if the right employee was selected, that appellant was paid more. A comparison to a specifically chosen employee should be scrutinized closely to determine its usefulness. Apparently appellant chose to compare her wage to that of Larkins because he was hired at approximately the same time. Recognizing that this occurrence might color appellant's comparison with some reliability, it also suggests other factors which diminish the reliability of an individualized comparison.

Larkins was hired initially as an extrusion machine operator and through the time period in question had performed that job for more than two and one-half years. Appellant through the time period in question had operated extrusion machines for only slightly more than one and one-half years. Larkins' job performance was superior to that of appellant.[9] These factors undermine the reliability and persuasiveness of appellant's comparison.

The average wage reflects a consideration of factors such as experience and job performance, and absent special circumstances provides a more reliable basis for comparison. If there was evidence indicating that appellant had the most operator experience and performed the best work, then a comparison to average wage might not accurately reflect appellant's worth and might be less reliable than a comparison to the wage of an individual possessing similar experience and skill. There is, however, no evidence indicating that to be the case with appellant and Larkins.

By relying on a comparison to the average wage we do not, however, suggest that this statistical data is infallible. We carefully avoid undue reliance on statistics presented in a Title VII case. *See id.* at 1355 n.3 (McMillian, J., dissenting). We only find that in the present circumstances one set of data is more useful than another. *See International Brotherhood of Teamsters v. United States*, 431 U.S. at 340, 97 S.Ct. at 1856. As indicated, we are concerned here with the question whether appellant was paid less than her fellow employees. Showing that appellant was paid less than one male employee is not, in the present circumstances, sufficient to support such an inference. More reliable data dictate the opposite inference.

| 8. Date | Appellant's Hourly Wage | Appellant's Job Classification | Number of Male Employees with Same Job Classification | Average Hourly Wage of Male Employees with Same Job Classification |
|---|---|---|---|---|
| 9/30/72 | $ 2.65 | F–2 | None | — |
| 11/30/72 | 2.80 | E–2 | One | $ 2.74 |
| 9/1/73 | 3.15 | E–2 | Six | 3.08 |
| 5/4/74 | 3.96 | E–3 | Six | 4.02 |
| 11/28/74 | 4.25 | E–3 | Seven | 4.17 |
| 5/10/75 | 4.91 | E–4 | One | 5.01 |

9. See *Assistant Supervisor Position* discussion *infra.*

"We have previously found statistics to speak loudly in discrimination cases," *Eubanks v. Pickens-Bond Construction Co.*, at 1347, and we hold that the available statistical data preclude us from concluding that the district court was clearly erroneous in finding that appellant was not denied equal pay. *Cedeck v. Hamiltonian Federal Savings & Loan Ass'n*, 551 F.2d at 1138.

*Layoff.*

■ Appellant was laid off in October, 1972 and rehired in December, 1972. Not until July 1, 1975 did appellant complain to the EEOC that Tetra had, by laying her off, violated Title VII. Appellant's failure to complain of the alleged discriminatory layoff within 180 days after its occurrence left the district court without jurisdiction to address appellant's allegation.[10] *United Air Lines, Inc. v. Evans*, 431 U.S. at 555 n.4, 97 S.Ct. at 1887 n.4. See *Job Assignment* discussion *supra.*

*Assistant Supervisor Position.*

■ Appellant alleges that because she was a female she was denied the job of assistant supervisor. To establish her prima facie case appellant showed (1) that she expressed an interest in the job, (2) that she was told she would not receive it, and (3) that a male employee subsequently was given the job. Accepting this as sufficient to. establish a prima facie case, the district court nonetheless found that Tetra had articulated a legitimate business consideration upon which to base its rejection of appellant's application. We cannot say that the district court's determination of this issue was clearly erroneous.

■ Tetra produced evidence tending to show that appellant was denied the assistant supervisor job because she was not the most qualified.[11] The question whether an individual is qualified is certainly a legitimate one upon which to base an employment decision. *Meyer v. Missouri State Highway Commission*, 567 F.2d 804, 809 (8th Cir. 1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1888, 56 L.Ed.2d 395 (1978). Title VII is not violated when an employer refuses to promote an employee because that employee is not qualified due to a lack of ability. *Marquez v. Omaha District Sales, Ford Division*, 440 F.2d 1157, 1159 (8th Cir. 1971).

A trouble-shooter was needed to perform the assistant supervisor job. Often during production an extrusion machine would malfunction and the assistant supervisor was responsible for repairing it. Gary Larkins possessed mechanical abilities and had much knowledge of the various job lines. He understood how the extrusion machines operated and had shown an ability to remedy extrusion machine malfunctions. Larkins was not, however, an ideal employee. His temperament was uneven and he often was uncooperative.

Appellant, on the other hand, although a good employee, exhibited little mechanical ability and showed little understanding of how the extrusion machines operated. She was a diligent worker whose primary skill was producing good work from those lines already in production. This skill, though admirable, was not the skill needed for the assistant supervisor job. Gary Larkins was given the assistant supervisor job because

---

10. Even assuming jurisdiction was .proper, appellant's allegation does not appear to have merit. She does not challenge the legitimacy of Tetra's layoff, but rather contends that this layoff gave a present effect to past discriminatory conduct, namely, appellant's initial assignment to the fabrication department. It is far from clear that legitimate employment practices, which give present effect to time barred discriminatory conduct, provide a basis for a Title VII action. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557–60, 97 S.Ct. 1885, 1888–90, 52 L.Ed.2d 571 (1977).

11. In supporting the district court's conclusion that appellant was not the best qualified, we rely only on evidence relating to appellant's job performance prior to July, 1975, the point in time when appellant was told she would not be made assistant supervisor. Instances of poor job performance occurring after July, 1975 may not be advanced by Tetra as reasons for denying appellant the assistant supervisor job. Such evidence, however, might have some relevance in buttressing Tetra's general assertion that appellant did not possess the necessary skill.

he possessed the necessary mechanical skills. Appellant was not given the assistant supervisor job because she did not possess the necessary mechanical skills.

### III.

■ Appellant alleges that Tetra violated section 704 of Title VII by retaliating against her for filing a complaint with the EEOC. "The order and allocation of proof in Title VII suits generally is also applied in cases alleging retaliation for participation in Title VII processes." *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir. 1980), *cert. denied* —— U.. ——, 101 S.Ct. 1513, 67 L.Ed.2d 814. (U.S. March 2, 1981). To establish a prima facie case of retaliation a plaintiff must show statutorily protected activity and an adverse employment action from which one may infer a causal connection between the two. *Id.*

■ Without question, filing a complaint with the EEOC is statutorily protected activity. Appellant claims that Tetra, in response to this protected activity, took the following action: (1) reclassified appellant from E–4 to E–3a; (2) froze appellant's wages; (3) transferred appellant to the first shift; and (4) monitored appellant's work. The district court, assuming that appellant had established a prima facie case, found that Tetra had articulated legitimate business reasons which adequately explained their actions and rebutted any causal inference. We cannot say that this finding is clearly erroneous.

Tetra, in response to a Labor Department investigation, decided in February, 1977 to re-examine its job classification system and salary structure. A personnel expert was hired and a study undertaken. Following this study the expert recommended that the E–4 job classification be abolished and a new classification, E–3a, created. This recommendation was made because new machinery had been introduced which required less skill to operate. The level of skill required to operate the new machinery did not justify an E–4 job classification. Acting as recommended, Tetra abolished the E–4 classification. Tetra's action in follow-

ing sound professional advice clearly amounts to legitimate business conduct.

The same rationale applies to the freezing of appellant's wages. Her wages were frozen solely so they would reflect the new job classification structure. Appellant was not subjected to any reduction in pay.

Appellant has failed to present evidence sufficient to prove that the reason articulated by Tetra is merely a pretext. To the contrary, the fact that the new classification system and salary structure applied to all employees, at least one of whom was male, is strong evidence that Tetra's action was not retaliatory.

Appellant's transfer to the first shift was made to mollify her. She constantly complained that job training on the third shift was inadequate and that she needed more training. To remedy this alleged inadequacy, Tetra transferred her to the first shift. Although there was no formal training on the first shift, a greater variety of work was performed which enabled an employee to acquire more skills. Tetra's action to accommodate appellant's complaints and provide her with more training cannot be characterized as retaliatory.

Finally, appellant contends that Tetra retaliated by monitoring her work. This contention is meritless. Appellant's work was monitored only after it became obvious that her performance had sharply declined. It was this declining job performance, and not any retaliation, that caused the monitoring of appellant's work and the resulting poor work reports.

After considering the parties' arguments and thoroughly examining the record, we affirm the judgment of the district court.