**Barbara J. BRUNETTI, Plaintiff,**

v.

**WAL–MART STORES, INC., Defendant.**

No. J–C–79–67.

United States District Court,
E. D. Arkansas,
Jonesboro Division.

Nov. 23, 1981.

Elizabeth McKanna and G. Philip Arnold, Ratner & Sugarmon, Memphis, Tenn., Marc Baretz, West Memphis, Ark., for plaintiff.

William H. Bruckner, Houston, Tex., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

Plaintiff Barbara J. Brunetti brought this cause pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, seeking injunctive, declaratory and monetary relief against defendant Wal-Mart Stores, Inc. (hereinafter referred to as "Wal-Mart"). Plaintiff has alleged that defendant discriminated against her in terms of compensation because of her sex. As a result of this alleged discrimination, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on or about August 9, 1978. Approximately seven months later, on March 3, 1979, plaintiff was discharged by defendant. Plaintiff has alleged that her termination by defendant was in retaliation for her filing the charge of discrimination the previous August.

The case was tried to the Court without a jury on May 7 and 8, 1981, in Jonesboro, Arkansas. Proposed findings of fact and conclusions of law and written argument have been received from both parties. Therefore, the Court now makes these findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff is a caucasian female who resides in Hughes, Arkansas. She was employed by Wal-Mart in its West Memphis, Arkansas, store from August 20, 1977, until her termination on March 3, 1979.

Defendant is a corporation with its principal office in Bentonville, Arkansas. It is engaged in the sale of merchandise at retail stores located in several states. The store that is the subject of this proceeding is located in West Memphis, Arkansas, and is designated as Store No. 70. Defendant is an employer within the meaning of Title VII.

### A. Unequal Pay

Ms. Brunetti was hired by Wal-Mart on or about August 20, 1977, as a cashier, receiving $2.75 per hour in pay. Prior to working at Wal-Mart, Ms. Brunetti had sev-

eral years of experience in the retail business, including stocking shelves and working with customers at Walgreens and Sears in Pine Bluff, Arkansas, and working as a cashier, bookkeeper and general merchandise manager at Winn Dixie Stores, Inc., in Miami, Florida, and Charlotte, North Carolina. At Winn Dixie Stores Ms. Brunetti also helped prepare orders for the entire store and stock shelves. In addition, Ms. Brunetti had received training at the Vo-Tech Trade School in Pine Bluff.

In early September 1977 Ms. Brunetti was moved to the automotive department of Wal-Mart as manager, which position she held for approximately six months. Around the middle of March 1978, Bruce McCaleb, the sporting goods department head, walked off the job leaving no manager in that area. From that day forward Ms. Brunetti assumed the responsibilities of automotive and sporting goods manager. Her rate of pay was increased by $0.15 per hour at this time. Then, in late July 1978, she received a $0.25 per hour raise, thus putting her salary at $3.15 per hour.

Defendant denies that Ms. Brunetti was actually the department manager of automotives and sporting goods during the period of March 1978—September 1978. Rather, defendant contends that she was in the position of "manager trainee." It is the finding of the Court, however, that Ms. Brunetti both performed the functions and held the title of manager of both departments from the time Bruce McCaleb left his employ in March 1978.

The evidence at trial showed that each department either had a manager or was grouped with another department over which one manager served as supervisor. No other employee was identified as manager of automotives or sporting goods during the time in question. Around the middle of April 1978 Ms. Brunetti received an identification tag indicating she was the department manager from assistant store manager, Jessie Manley. Receiving this tag was considered by Ms. Brunetti to be official notification of her appointment as department manager of automotives and sporting

goods. Although Ms. Manley does not recall giving the plaintiff this badge, Mr. Johnson, the store manager at that time, testified that Ms. Manley was doing a lot of the interviewing and hiring during his tenure as manager and he stated, "If Barbara needed [a manager's badge], I'm sure Jessie would give her one."

At least three evaluations of Ms. Brunetti's performance were prepared between March and September 1978, all of which refer to her as department manager. The first one, prepared by the district sporting goods manager on May 26, 1978, lists Barbara Brunetti as the section head, evaluates her as the department manager, and has her signature as department manager at the end of the report. A second similar evaluation was prepared on July 6, 1978. It also identifies Ms. Brunetti as department manager in each of the categories cited above. The third evaluation, prepared by Mr. Johnson on August 14, 1978, describes Ms. Brunetti's ability "to run both sporting goods and automotives." Another section of this evaluation rated Ms. Brunetti's potential for further advancement in management. Mr. Johnson testified that he did not consider Barbara for any management position beyond that of department manager because there was a good possibility that such position would require transferring to a different store, and Ms. Brunetti, he believed, would not want to move because of her family situation.

Despite the fact that Ms. Brunetti had both assumed the responsibilities and been given the title of automotive and sporting goods manager, she was paid substantially less than Bruce McCaleb, her male predecessor. As noted above, she was hired at $2.75 per hour and received no increase when she was transferred to automotives as manager. In March 1978, shortly after Mr. McCaleb walked out as sporting goods manager, she received a raise to $2.90 per hour. Several months later, in July, she was raised to $3.15 per hour. At the time Mr. McCaleb left, he was earning $4.00 per hour, even though he had charge of only one department—sporting goods.

Prior to filing a charge with the EEOC in August 1978, Ms. Brunetti discussed her concerns over the low rate of pay with Mr. Hubbard, the assistant store manager, and with Jim McClure, the district sporting goods manager. She stated that Mr. McClure told her he thought $4.00 an hour was a fair wage for that job. These discussions were consistent with the chain of command established at the Wal-Mart Stores. Ms. Brunetti approached the assistant manager three times prior to filing her charge. Despite these three requests, Ms. Brunetti received no raise. Thus, on August 9, 1978, Ms. Brunetti filed a charge with the EEOC alleging discrimination in pay based on sex.

Additional evidence of discriminatory pay was adduced at trial. A clerk in Ms. Brunetti's department, James Morgan, who started work on July 31, 1978, was paid $2.70 per hour. Until mid-July, Ms. Brunetti was earning $2.90 per hour. At that time she received a raise to $3.15 per hour. The slight difference in these salaries compared to the substantial difference in responsibilities and experience results in the inference that Ms. Brunetti's rate of pay was disproportionately low.

Ms. Brunetti was manager of both the automotive and sporting goods departments from mid-March 1978 until her termination in March 1979. Although she did receive raises in pay throughout her employment at Wal-Mart, it was not until January 26, 1979, that she was earning $4.00 per hour, the same salary her predecessor, who managed only one department, was earning nearly a year earlier. Furthermore, her predecessor had been at that rate since July 1977, and the Court finds that had he remained, it is reasonable to assume he would have received raises comparable to or greater than those received by Ms. Brunetti through January 26, 1979.

### B. Retaliatory Treatment and Termination

The fact that Ms. Brunetti filed a charge of discrimination against the defendant became known almost immediately by Wal-Mart management and sales personnel.

Mr. Johnson testified that he learned of Ms. Brunetti's charge from another employee. He then in turn called Mr. Trainer, the district manager, and had subsequent discussions concerning the suit with company officials in Bentonville. The assistant manager, Mr. Bogue, learned of Ms. Brunetti's lawsuit against the company upon his arrival at the store in November 1978 from both Mr. Johnson and Mr. Trainer.

The employees, in general, were also aware of Ms. Brunetti's charge. In fact, the gossip concerning her and her suit was so intense that Ms. Brunetti requested a statement prohibiting gossip to be made a part of her counseling record of September 25, 1978, which record was issued approximately 1½ months after she filed her charge. The memo covers three issues: allegedly official appointment of the plaintiff to department manager position; a warning to all employees regarding gossip about her charge; and a request that an effort be made to reestablish an open line of communication between the plaintiff and Messrs. Johnson and Trainer. Each of the items in the counseling session concerns Ms. Brunetti's charge. Specifically, the form purports to confer upon Ms. Brunetti full responsibilities as department manager of the two departments. In fact, the testimony and exhibits adduced at trial clearly reveal that Ms. Brunetti had taken on these responsibilities long before September, 1978. Thus, the Court finds that the September 25, 1978, counseling form was prepared as an attempt to establish a defense to Ms. Brunetti's charge that she was paid less than the preceding sporting goods manager because she was female. The Court finds that no evidence has been introduced to establish a practice of assigning persons to department manager *trainee* positions prior to making them managers. To the extent this title was applied by Wal-Mart in the case of Ms. Brunetti, the Court finds it was done in retrospect as a pretext to justify her lower pay.

Other incidents of retaliatory treatment also occurred subsequent to the filing of Ms. Brunetti's EEOC charge. Mr. Johnson tes-

tified that Mr. Trainer told him that Wal-Mart's vice president of operations, Thomas Jefferson, "told him to have me fire her." Mr. Johnson recalled that he told Mr. Trainer he did not think it would be a very wise thing to do since she had recently filed an EEOC lawsuit. According to Mr. Johnson, Mr. Trainer's response was, "Well, build a case on her."

Although Mr. Trainer denied ever telling Mr. Johnson to fire the plaintiff, he did say that Mr. Jefferson had stated that no one could be fired from Wal-Mart without a case in writing to substantiate the dismissal. Mr. Trainer went on to say that he informed Mr. Johnson he must have a case in writing before he could fire Ms. Brunetti and Mr. Trainer admitted, "I could not find it [evidence of poor performance] in [her] personnel record." Contrary to the statements of Mr. Trainer, Mr. Johnson testified that it was Mr. Trainer who raised the issue of firing Ms. Brunetti. The Court finds this testimony to be most convincing in light of the following facts:

With the exception of the counseling form of September 25, 1978, discussed above, Mr. Johnson did not prepare any written evaluations of Ms. Brunetti's work prior to his own termination in early January 1979. Thus, he apparently did not attempt to "build a case" on her. According to the testimony of the assistant store manager, Jim Bogue, Mr. Johnson's approach to Ms. Brunetti was "not to put any undue pressure on her, but not to make any exceptions for her because she had a lawsuit against Wal-Mart."

Conflict existed between Mr. Johnson and Mr. Trainer. The latter, who was the West Memphis store manager prior to Mr. Johnson, still exercised a great deal of control over the store personnel. Mr. Johnson testified that Mr. Trainer had refused to let him terminate two employees, Sandra Hays and Jo Bounds. It was not until the decision to replace Mr. Johnson was made that the process of building a documented case against Ms. Brunetti began.

The only documented criticism of Ms. Brunetti's performance concerned three in-cidents: her incorrect reading of an advertisement in December, 1978; the condition of her department on the day of inventory in mid-February 1979; and the condition of her department on the day Mr. Shewmaker, president of Wal-Mart, visited the store in late February 1979.

With respect to the first write-up on December 29, 1978, Ms. Brunetti stated that she believed the advertisement in question was for all guns and that she did not understand that it was meant to apply to only certain items. Once she was informed of the mistake, she corrected it immediately. No evidence of a recurrence of this problem was presented. The two other write-ups concern the condition of the automotive and sporting goods departments on days when Ms. Brunetti was not working. Ms. Brunetti testified that she did not work on either the day of inventory or the day before.

There was some confusion in the record as to the exact date of inventory. Mr. Harris, the store manager who replaced Mr. Johnson in January 1979, testified that inventory took place on February 15, 1979. The counseling form issued to Ms. Brunetti reflects the "incident" occurred on February 14, 1979. Ms. Brunetti could not remember the exact date but clearly remembers that she was not scheduled to work. According to Ms. Brunetti's notes used to refresh her recollection, she did not work on February 15 nor on February 16. According to Mr. Harris' reading of the Wal-Mart time records, Ms. Brunetti did not work on February 16. Mr. Harris had no personal recollection of whether and when Ms. Brunetti worked. In light of the inconsistencies within the various records, the Court finds Ms. Brunetti's clear recollection of the fact that she did not work on the day of inventory to be the most credible.

No question exists concerning the second date on which the condition of Ms. Brunetti's department caused her to receive a reprimand. The company president, Mr. Shewmaker, visited the store on February 27, 1979. Ms. Brunetti was definitely not at work on that day or the day before. These were days when she was scheduled to be off

work. Ms. Brunetti also had been ill on February 23 and 24—her first sick days since she began with Wal-Mart. Thus, she had not been in the department four of the five days preceding Mr. Shewmaker's visit.

In the February 27 incident report, Ms. Brunetti was criticized primarily for the general condition of the department, including housekeeping, stock in the aisles, and merchandise out on the counter. When a department manager is not in the store, the assistant store manager is responsible for running the department. The Court notes that the conditions described generally develop over a short period of time. Thus, the Court finds that the write-up of March 3, 1979, concerning the condition of the department on February 27 was unjustified in light of the fact that Mr. Bogue, the assistant store manager, had been in charge of the plaintiff's departments for four of the five preceding days and should have insured that they were in proper condition. The write-up concerning Mr. Shewmaker's visit was not prepared until March 3, 1979, the date upon which Ms. Brunetti was terminated (without notice). Based on the evidence as a whole, the Court finds this counseling record to be a pretext for terminating Ms. Brunetti rather than an objective evaluation of her performance as an employee.

With respect to the write-up concerning inventory day, the Court notes that Mr. Bogue was also partially responsible for the condition of the department at that time. Moreover, Mr. Trainer, the district manager, testified that none of the plaintiff's counseling records alone would have been sufficient to justify her termination. In light of the Court's ruling that the March 3, 1979, write-up was unjustified and that the December 29, 1978, write-up involved a single occurrence based on honest mistake, the Court finds Ms. Brunetti's termination is not supported by the documentary evidence.

Furthermore, the evaluation of the district sporting goods manager less than a month before Ms. Brunetti was fired states, "I visited Store No. 70, West Memphis, Arkansas, today. Both departments looked good. There sure has been a lot of work done here to improve the departments. Barbara is doing a good job . . ." This evaluation was issued February 6, 1979.

The defendant presented certain additional testimony concerning Ms. Brunetti's performance. The areas criticized included sending in late orders, not getting along with co-workers or with customers, and failing to wear a sales smock. None of these incidents, however, were deemed significant enough to justify a written counseling record.

With respect to ordering, Mr. Harris admitted that the problem had developed before he or Mr. Bogue came to the store because the prior assistant store manager had "really just sent the order through without really knowing that much about it or without checking it." Thus, to the extent any problems in this area existed, they were partially attributable to poor management-level assistance. Moreover, Mr. Harris stated that in January 1979 he "instructed Mr. Bogue to have full control of the ordering systems in order to get the inventory back in line." Thus, any errors in ordering as of this date were ultimately the responsibility of Mr. Bogue. To base Ms. Brunetti's termination on such errors would be inequitable.

Ms. Brunetti was also accused by a fellow employee, Ms. Bounds, of not wearing her sales smock at all times while on the sales floor. However, both Ms. Brunetti and a clerk in her department, James Morgan, testified that she wore her smock at all times except while she was on break. Upon cross-examination, Ms. Bounds admitted that she only observed Ms. Brunetti without her smock when she was going to and coming from the lounge. Moreover, Mr. Morgan stated that the male employees initially had no requirement to wear a smock and that when such a policy was established, it was totally ignored. No reprimands were given to the males for such action.

Mr. Harris also stated that a factor in his decision to terminate Ms. Brunetti was her

inability to get along with co-workers. Upon cross-examination, however, Mr. Harris admitted that this conclusion was grounded upon complaints from two clerks, Dennis Langley and Tommy Grubbs. Ms. Brunetti had made numerous complaints to Mr. Bogue and to Mr. Harris concerning the performance of these two clerks. Mr. Morgan also made such complaints. Once Ms. Brunetti reported that Tommy Grubbs came to work admittedly intoxicated. Upon informing Mr. Bogue of the situation, however, Ms. Brunetti was told that Tommy was "just being a boy" and not to bother him.

■ Finally, the actual decision to terminate Ms. Brunetti rather than transfer her to a lateral position is clear and convincing proof that retaliation was a motivating factor. Mr. Shewmaker, president of Wal-Mart, stated in his deposition of February 26, 1980, that it was a company principle of Wal-Mart to offer employees "an opportunity to transfer or get into a different job if his performance has been poor." Mr. Shewmaker continued, "I could tell you of a number of people that we've got throughout the company that we've offered lateral positions to, temporary step downs that have stayed with us, or rehires."

Mr. Shewmaker also testified that he was not aware of any plan to fire Ms. Brunetti after his meeting with Messrs. Trainer and Harris at the West Memphis store in late February 1979. Mr. Harris admitted that it was his decision to terminate Ms. Brunetti, based on his assessment that she would be antagonistic toward customers as a cashier, if moved into that position. The primary basis for this decision was what Mr. Harris characterized as a fear that she would antagonize customers.

No prior complaints, either written or verbal, had ever been made to Ms. Brunetti concerning her ability to relate to customers. In fact, the evidence shows that she was very good at answering their questions and sometimes, according to Mr. Harris, she spent too much time taking care of them.

Numerous factors, such as an alleged dislike for Mr. Trainer and the complaints of Dennis Langley and Tommy Grubbs, were listed by the defendant as evidence of her antagonism. None of these factors justify deviation from a well-established practice of offering a lateral transfer. Thus, the Court finds that retaliation was a motivating factor in the decision to terminate rather than transfer Ms. Brunetti.

## CONCLUSIONS OF LAW

### A. Unequal Pay

Jurisdiction for this case is established under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Section 2000e–2(a) states in pertinent part:

"It shall be an unlawful employment practice for an employer—

"(1) . . . to discriminate against any individual with respect to his *compensation*, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin; . . ." [Emphasis added.]

■ In a private, single-plaintiff action alleging employment discrimination, the plaintiff has the initial burden of making out a prima facie case of discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 338, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

Based upon the findings of fact set forth above, Ms. Brunetti was performing all of the functions and given all of the responsibilities of automotive department manager from the date she began working in that department, early September 1977, through the date of her termination. She also was performing the job of sporting goods manager from mid-March 1978 through the date of her termination. However, her rate of

pay was consistently far below that paid to the male employee holding this same position prior to her appointment and was proportionately lower than those employees working under her.

█ The ultimate issue raised by the plaintiff with respect to her equal-pay claim is whether sex was a factor in the challenged employment decision. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Satz v. ITT Financial Corp.*, 619 F.2d 738 (8th Cir. 1980). The plaintiff must show that she performed substantially the same work as a male employee but was paid less for such work. *Strecker v. Grand Forks County Social Services Board*, 640 F.2d 96 (8th Cir. 1980). In drawing this comparison a plaintiff may present evidence concerning persons holding the same positions or one of equal skill, effort and responsibility. The rate of pay of an immediate predecessor has also been found relevant. *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041 (5th Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973). *See, also*, 29 C.F.R. § 800.114(b).

█ The defendant has attempted to refute plaintiff's prima facie showing of discrimination by pointing out that the plaintiff failed to compare herself with the average wage of the entire male work force at the store. This argument must fail, however, for two reasons. First, the statement is inaccurate: the record at trial does include evidence of the wages earned by other employees. Second, under the circumstances of this case, only one other person in the store had performed substantially the same work as the plaintiff, to-wit, Bruce McCaleb, her male predecessor. In a case such as this, comparison between the plaintiff and Mr. McCaleb is sufficient evidence necessary to establish a prima facie case. Compare *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115 (8th Cir. 1981), upon which the defendant relies. In that case the plaintiff and the male employee chosen for comparison had only held the same job classification for a short period of time. Therefore, the Court concluded that the limited compari-

son presented was inappropriate under those particular circumstances. *Id.* at 122. The Court found that several other employees of the defendant were also performing the same work and should have been used as a basis of comparison. Accordingly, the case was remanded for further consideration.

In the instant case the only employee with whom Ms. Brunetti can be adequately compared is her predecessor, Mr. McCaleb. Substantial testimony was submitted concerning the additional duties performed by the automotive and sporting goods manager, including but not limited to running a cash register and keeping a gun register. Thus, under the circumstances here, the Court finds that comparison with just one employee is appropriate.

█ It is thus the finding of the Court that the plaintiff successfully met her burden of establishing a prima facie case of gender-based discrimination. Once such a prima facie case has been made by the plaintiff, it is then incumbent upon the defendant, in rebuttal, to articulate some legitimate, nondiscriminatory reason for its employment decision. See *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Taylor v. Teletype Corp.*, 648 F.2d 1129 (8th Cir. 1981); *Heymann v. Tetra Plastics Corp., supra; Ligons v. Bechtel Power Corp.*, 625 F.2d 771 (8th Cir. 1980). The defendant's burden of production, the plaintiff's continuing burden of persuasion, and the reasons therefor were succinctly set forth in the recent United States Supreme Court decision of *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), as follows:

"The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. See *Sweeney*, supra, [439 U.S.,] at 25, 99 S.Ct., at 296. It is suffi-

cient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

"Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

"The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See *McDonnell Douglas*, supra, [411 U.S.] at 804–805, 93 S.Ct., at 1825–1826."

101 S.Ct. at 1094–1095.

▆ Certain exceptions have been recognized as being legitimate reasons for the payment of disparate wages, to-wit, (1) a difference based on a seniority system; (2) a difference based on a merit system; (3) a difference based on a system which measures earnings by quantity or quality of production; and (4) a difference based on any factor other than sex. *Corning Glass*

*Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); 29 U.S.C. § 206(d). The Court finds, however, that none of these exceptions were shown to be present in the instant case.

▆ The primary reason put forth by the defendant for the difference between the salaries of Bruce McCaleb and Ms. Brunetti was that Mr. McCaleb had been transferred to the West Memphis store from a Wal-Mart store in the Little Rock area. The defense relies upon the fact that Mr. McCaleb was transferred from a metropolitan area store, where wages were accordingly higher, and, consistent with company policy, he was not asked to take a cut in pay when he transferred to the West Memphis store. The Court finds that this defense is pretextual based on the following additional findings:

a. Although testimony was given to support the fact that the store in the metropolitan area of Little Rock paid higher wages than that in West Memphis, no testimony as to the precise difference was submitted.

b. Contrary to the defendant's assertion that Wal-Mart's company policy allows an employee to carry his wages with him when he transfers to another Wal-Mart store, the evidence showed that one employee, Sheila Vaughn, transferred from Millington, Tennessee, to the Sikeston, Missouri, store and was required to work for $0.35 per hour less at the Missouri store. No break in employment occurred between this transfer. In addition, another employee, Daryl Jones, was required to work for less money on a temporary assignment to the Covington, Tennessee, store from the West Memphis, Arkansas, store in March 1978. Mr. McCaleb is the only specific example presented of an employee who transferred from another Wal-Mart store and who, as a result of the transfer, was not required to work for less money. Therefore, the Court finds that the alleged policy of the defendant is not sufficiently supported by the facts in evidence concerning the actual practice of the company.

c. The defendant failed to submit any evidence of Mr. McCaleb's qualifications or

the quantity or quality of his work, except for the fact that he was only manager of one department, whereas Ms. Brunetti managed both departments. In light of the fact that he walked off the job one day without any notice, his reliability as an employee is certainly questionable. In contrast, the evidence showed that Ms. Brunetti had several years of experience in managing and merchandising prior to employment at Wal-Mart. Her attendance record was exceptional in that she was absent from work for only two days during the entire period of her employment. Her familiarity with the merchandise in both departments was excellent and according to the district sporting goods manager her performance was satisfactory. She in fact did receive minimal raises throughout her tenure; however, it was not until January 26, 1979, that her pay equaled that earned by Mr. McCaleb when he left the store in March 1978. Had Mr. McCaleb stayed at the store, the Court infers he would have received incremental raises comparable to or greater than those given to Ms. Brunetti and, therefore, by January 26, 1979, would have been making substantially more than $4.00 per hour.

The Court finds that the defense raised by Wal-Mart is a mere pretext designed to conceal a discriminatory salary policy with respect to plaintiff Ms. Brunetti. Accordingly, the defendant is found to be in violation of Title VII and Ms. Brunetti is entitled to back pay. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Taylor v. Teletype Corp., supra; Taylor v. Philips Industries, Inc.,* 593 F.2d 783 (7th Cir. 1979).

### B. Retaliatory Treatment

The plaintiff is also entitled to relief based on her termination from employment by the defendant. The Court finds that subsequent to the filing of her claim for unequal pay with the EEOC the defendant, through its agents, set forth on a deliberate course of action to establish a case against Ms. Brunetti which would justify her ultimate termination.

The defendant attempts to challenge this conclusion by alleging that there is no causal connection between Ms. Brunetti's filing of the charge in August and her subsequent discharge. However, the facts as set forth above demonstrate that the only logical and consistent explanation for the defendant's actions, which eventually resulted in Ms. Brunetti's termination, is that such actions were in part, if not totally, motivated by retaliation.

Title VII, 42 U.S.C. § 2000e–3(a) provides:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

■ The burden of proof in a claim of retaliation is governed by the standards set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to establish a prima facie case of discrimination, the plaintiff must show (1) that she has either engaged in opposition to Title VII discrimination or participated in a Title VII proceeding; (2) that she received adverse treatment from the employer contemporaneous with or subsequent to the opposition or participation; and (3) that there is evidence of a causal connection between the basis and the issue, namely, that a retaliatory motive played a part in the adverse treatment, which requires among other things a showing that the employer had actual or imputed knowledge of the opposition or participation. Schlei and Grossman, *Employment Discrimination Law* (1976), p. 436; *Hochstadt v. Worcester Foundation,* 425 F.Supp. 318 (D.Mass.1976), aff'd., 545 F.2d 222 (1st Cir. 1976).

■ The facts set forth above demonstrate that each of these elements is present in the instant case. Ms. Brunetti was clearly engaged in a protected activity by filing

her charge. Moreover, the evidence reveals that each of Ms. Brunetti's supervisors and many of her co-workers were aware of the claim against the company shortly after it was filed.

Adverse treatment of the plaintiff took many forms, including certain actions designed to create a defense to her charge of sex discrimination. In order to refute the claims made by Ms. Brunetti, the defendant issued a memorandum approximately 1½ months after her EEOC charge was filed, purporting to officially appoint her to the position of automotive and sporting goods department manager. The Court has found this memo to have been prepared solely for the purpose of defending an eventual lawsuit, in light of earlier evaluations prepared to assess Ms. Brunetti's work. These earlier evaluations clearly demonstrate that she was holding the position of department manager well before September 25, 1978.

In addition to building a defense against the equal-pay claim, the defendant attempted to create a documented record which would justify Ms. Brunetti's eventual termination. The store manager, Charlie Johnson, testified that he received instructions from Mr. Jefferson, the assistant vice-president, via Mr. Trainer, the district manager, to fire the plaintiff. When Mr. Johnson stated he did not think that was a good idea due to her pending EEOC claim, Mr. Trainer instructed Mr. Johnson to "build a case" on her.

Furthermore, the evidence showed that Ms. Brunetti frequently requested additional help or more competent help in her department in order to operate in a more efficient manner. None of these requests were honored. Instead, the assistant manager, Jim Bogue, often created extra work or reassigned the persons working in her department to carry out his own ideas concerning how the department should be arranged. In addition, the evidence showed that Mr. Bogue was frequently in the department socializing with the employees rather than making sure they performed their duties in the evenings after Ms. Brunetti had gone home.

The ultimate act of retaliation was the decision of Wal-Mart to fire Ms. Brunetti. The findings of fact set forth above concerning her discharge present two patterns of action on the part of the defendant. The first was an increased effort to "build a case" on her. The second was an effort to place the blame for an unsatisfactory report upon Ms. Brunetti rather than upon those persons actually in charge of the area and responsible for its condition at the times in question.

The facts show that prior to March 3, 1979, Ms. Brunetti had only two reports in her personnel file which were unsatisfactory. One of these was based on what may best be characterized as an honest mistake in her reading of an advertisement. The second was based on the condition of Ms. Brunetti's department during the inventory taken in mid-February 1979. Ms. Brunetti was criticized for the state of her department on inventory day, even though she was not scheduled to work either the day before or the day of inventory.

Neither of these reprimands was accompanied by a warning that Ms. Brunetti's job was in jeopardy. The defendant's representative, Mr. Harris, admitted that neither of them alone was sufficient to justify dismissal. The final evaluation upon which Ms. Brunetti's termination was based was not issued until the decision to terminate her had already been made, i.e., on March 3, 1979. That reprimand was issued after the company president, Mr. Shewmaker, had visited the West Memphis store and found the department to be in poor condition. The fact that Ms. Brunetti had been unable to work for two days due to illness and had not been scheduled to work for two additional days out of the five days prior to Mr. Shewmaker's visit obviously was not taken into consideration in making this report. In her absence the duty to maintain the department in areas such as general housekeeping, ordering basic stock and keeping the aisles clear of freight fell upon the assistant manager. These responsibilities apparently had not been taken care of by the assistant manager.

Not only did the store manager and district manager determine that Ms. Brunetti should be reprimanded for this incident, they also determined that she should be terminated. This decision was made even though it was contrary to the stated and practiced procedure of Wal-Mart Stores, that is, to transfer an employee who is not performing adequately to another area within the store. No conclusion can be drawn from this action other than that a clear intent existed on the part of the defendant to retaliate against Ms. Brunetti for her charge of discrimination.

Thus, the plaintiff has demonstrated a causal connection between the defendant's adverse treatment and eventual discharge of Ms. Brunetti and the filing of her EEOC charge. A retaliatory motive clearly played a part in the action leading to and the final decision to terminate her.

As in other claims of discrimination, once the plaintiff has established her prima facie case of retaliation, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory basis for its actions. *McDonnell Douglas Corp. v. Green, supra.* Such a showing, however, does not preclude a finding of violation based on retaliation. The plaintiff may still come forward and show that retaliatory discrimination contributed, among other things, to cause the discharge. *Hochstadt v. Worcestor Foundation, supra; Mead v. United States Fidelity & Guaranty Co.,* 442 F.Supp. 114 (D.Minn.1977); *Slotkin v. Human Development Corp. of Metropolitan St. Louis,* 454 F.Supp. 250 (E.D.Mo.1978).

Retaliation need not be the sole or even the primary reason for a discharge; as long as it was a factor, a violation under Section 2000e–3(a) has occurred. *Bradington v. International Business Machine Corp.,* 360 F.Supp. 845, 854 (D.Md.1973), *aff'd without opinion,* 492 F.2d 1240 (4th Cir. 1974). As stated in *McDonnell Douglas v. Green, supra,* 411 U.S. at 801, 93 S.Ct. at 1823, "Title VII tolerates no racial discrimination, subtle or otherwise." A finding of retaliatory discrimination is also not affected by the success or failure of the plaintiff's

charge of discriminatory practices. The act of retaliation is a separate violation, in and of itself, subject to findings of liability and remedial action. 42 U.S.C. 2000e–3; see *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d 998 (5th Cir. 1969).

With respect to the plaintiff's claim of retaliation, numerous explanations were given for the actions taken by the defendant. However, those actions in light of the more credible evidence clearly demonstrate that a concerted effort was made to build a case against Ms. Brunetti in order to justify her termination.

The testimony concerning her performance on the job is so contradictory to the documented evidence in her personnel file that neither source can be said to be clear or convincing. Two of the counseling records issued against Ms. Brunetti concerned periods of time when she was not even scheduled to be at work. Evaluations based on these periods of time are thus meaningless and suggest an effort to create a subterfuge, that is, to build a case against the plaintiff. In the latter case, the defendant's agents had advance notice of a visit from the president of the company, yet they apparently made no effort to clear the aisles of merchandise which had been received during the day in Ms. Brunetti's departments. The decision to terminate her as a result of this incident cannot be construed as anything other than an act of intentional retaliation. *Francis v. American Telephone & Telegraph Company,* 55 F.R.D. 202 (D.D.C.1972); *Long v. Ford Motor Company,* 496 F.2d 500, 505 n.11 (6th Cir. 1974).

## RELIEF

Based on the findings of liability in this cause, the plaintiff is entitled to a presumption that she will be made whole. *Albemarle Paper Co. v. Moody, supra.* Section 2000e–5(g) of Title VII vests in the district courts broad discretionary power to

"... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or

hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate."

Inherent in this broad grant of power is the authority to fashion decrees which will, insofar as possible, eliminate the discriminatory effects of past actions and bar discrimination in the future. Relief under Title VII is designed to put the plaintiff in his "rightful place," the place he would have been in but for the discriminatory action of the defendant. The plaintiff's "rightful place" may entitle her to injunctive relief, reinstatement and/or back pay. *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *McCormick v. Attala County Board of Education*, 541 F.2d 1094, 1095 (5th Cir. 1976).

Back pay, which is designed to compensate a victim of unlawful discrimination for the economic injuries of discrimination, is an integral part of Title VII. *Albemarle Paper Co. v. Moody, supra.* The district court's discretion in declining back pay is very limited. The amount of back pay due to a successful claimant is the difference between his actual earnings and what he would have earned absent the discrimination of the defendant. *Kamberos v. GTE Automatic Electric, Inc.*, 603 F.2d 598, 600 (7th Cir. 1979). Uncertainty involving entitlement should be resolved against the discriminating employer. *United States v. United States Steel Corp.*, 520 F.2d 1043, 1050 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976).

The party who has been discriminated against has the burden of proving the amount of damages to which he is entitled. *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 314–316 (6th Cir. 1975). However, the burden is on the defendant to prove any failure by the plaintiff to mitigate damages. *Kaplan v. International Alliance of Theatrical and Stage Employees*, 525 F.2d 1354 (9th Cir. 1975); *Hegler v. Board of Education*, 447 F.2d 1078 (8th Cir. 1971).

In the instant case the evidence shows that Ms. Brunetti was appointed as automotive department manager in the early part of September 1977. At that time she was making $2.70 per hour. The evidence further shows that in mid-March 1978 she assumed the full duties of automotive and sporting goods manager. At this period of time she was earning $2.90 per hour. Her predecessor in this position was earning $4.00 per hour when he left in mid-March 1978. The parties stipulated that should the Court find that an award of back pay was justified, the exact amount due would be calculated based upon the records of the defendant.

Based upon the evidence in this case, the Court finds the plaintiff is entitled to pay comparable to other department managers at the West Memphis store as of September 1977 and pay comparable to $4.00 an hour as of mid-March 1978, with incremental increases to be calculated at percentage rates equal to those raises received by Ms. Brunetti during her tenure at Wal-Mart. The amount of back pay should be calculated through the date of reinstatement at Wal-Mart.

In addition, Ms. Brunetti incurred certain medical expenses which, but for her termination, would have been covered by the group insurance policy which Wal-Mart has for its employees. Proof of such expenses, including but not limited to those related to her pregnancy and cancer, may be submitted. Provided they would have been covered by the policy, the plaintiff is entitled to reimbursement to the extent of the policy coverage.

Furthermore, during her employment there, the plaintiff purchased numerous items from Wal-Mart Stores, the price of which was reduced by the employee's 10 percent discount. The Court finds the plaintiff is entitled to the sum representing the total amount of the discounts which she would have received for any items which she can prove were purchased during the period following her termination.

The Court finds Ms. Brunetti is also entitled to injunctive relief in the form of reinstatement. Such relief, in general, is

clearly consistent with and contemplated by the provisions of Title VII, 42 U.S.C. 2000e–5(g); *Franks v. Bowman Transportation Co., supra; Mead v. United States Fidelity & Guaranty Co., supra,* at 133–34. Only by allowing the plaintiff to return to her previous position, her "rightful place," can she be made whole. Especially in cases where retaliation has occurred, such relief is necessary to remove the "chilling effect" on the plaintiff and other employees of the defendant's unlawful conduct.

The Court in *Mead v. United States Fidelity & Guaranty Co., supra,* found as follows:

> "Reinstatement is a uniquely appropriate remedy for this retaliatory discharge as it restores the status quo prior to the Company's illegal action, places plaintiff Mead in the position she was in and would be in but for the unlawful retaliation, and concretely establishes that plaintiff Mead has rights under Title VII. It will help to reduce the chilling effect and fear that the retaliatory discharge of Ms. Mead has engendered in both Ms. Mead and other employees.

> .    .    .    .    .

> "... This is particularly true in these circumstances where the discharge has infringed on Ms. Mead's federally protected rights and interfered with the administrative processes established by Title VII. As the plaintiffs have contended in this case, one of the central purposes of § 704(a) is to preserve free and uninhibited access to the EEOC. To limit Ms. Mead's remedies to monetary reimbursement would be to thwart one of the central purposes of § 704(a), a result which is totally unwarranted by the facts of this case."

442 F.Supp. at 133–134.

Although certain circumstances of particular jobs may cause reinstatement relief to be denied, see *EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919 (S.D.N.Y.1976), *aff'd without opinion,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977) (advertising account executive); *Hyland v. Kenner Products Co.,*

13 FEP 1309 (S.D.Ohio 1976) (nonsupervised white-collar employee); *Combes v. Griffin Television, Inc.,* 421 F.Supp. 841 (W.D.Okla. 1976) (television anchorman), the Court does not find similar circumstances to be present in this case. Each of the above-cited cases involved high-level employees in confidential and/or unique positions who were required to work closely with other executives in making decisions concerning policy and major changes. Such is simply not the situation in the case at hand, and reinstatement is thus an appropriate remedy.

Finally, there was evidence presented by the defendant that Ms. Brunetti made several hostile remarks about Wal-Mart and various of its agents soon after her termination. The Court finds that the exhibition of such hostility immediately after having been summarily fired was not unusual, and that the passage of nearly three years has likely attenuated Ms. Brunetti's previous anger.

Nor is the hostility which may have been engendered among Wal-Mart employees against Ms. Brunetti as a result of this litigation a valid reason for refusing to order reinstatement. As noted by the Eighth Circuit in *Taylor, et al., v. Teletype Corp.,* 648 F.2d 1129 (8th Cir. 1981), at 1138–1139,

> "... To deny reinstatement to a victim of discrimination merely because of the hostility engendered by the prosecution of a discrimination suit would frustrate the make-whole purpose of Title VII. Antagonism between parties occurs as the natural bi-product of any litigation. Thus, a court might deny reinstatement in virtually every case if it considered the hostility engendered from litigation as a bar to relief."

Ms. Brunetti is, therefore, entitled to reinstatement forthwith as department manager of the automotive and sporting goods departments, or to any other position comparable thereto. Her salary shall be based upon a rate determined to be that which she would have been earning but for the discrimination and unlawful termination. This determination shall be made based upon the defendant's records.

With respect to the plaintiff's claim for injunctive and declaratory relief against further discriminatory actions, the Court hereby enjoins the defendant from subjecting the plaintiff to any special conditions of employment or denying the plaintiff equal employment opportunity in any manner subsequent to her reinstatement.

Finally, the plaintiff is entitled to all costs and reasonable attorney fees incurred during her pursuit of this litigation.